Case No. 16-1453. The Robare Group, LTD. v. Securities and Exchange Commission. Ms. Van Hyde for Petitioners. Mr. Matthews for Respondents. Good morning. Good morning. May I please report? The majority of our briefs in this case dealt with the Commission's primary finding, which was that Mr. Robare and Mr. Jones, who are here today, acted negligently in crafting the disclosure that appears in their Form 80B and elsewhere over a considerable time period. The time period is 2005 until 2013. And I'd like to focus on that today in specifically two parts of the finding. The first being the Commission's finding that negligence existed despite the absence of a record as to the applicable standard of care over that time period imposed on an investment advisor when crafting and using disclosure language with their advisory clients. And second, the Commission's finding that they failed to act reasonably under the But before turning to those two things, a very brief perspective on the history of this case that is important to assessing the negligence claim. This was initially filed as both scienter-based and negligence-based charges. And that's important because the trial strategy of the Securities and Exchange Commission from the onset was to prove that the underlying conduct by my clients was so egregious that it met the standard of scienter, or at least recklessness. And that thereby they would clear the bar for negligence without further thought. The problem was that those claims were dismissed. The administrative law judge found not only that there was no scienter, but that even if they had shown scienter, that we had presented evidence that rebutted that finding. So on appeal, and the Commission upheld that on appeal. So on appeal, the record that they were left with was one of negligence. And the problem was that the record... Let me be clear. You said the Commission affirmed? What did they affirm? The Commission affirmed the finding that there was no scienter. All right. So, left with negligence. I thought the Commission said it was a de novo review. It is a de novo review. All right. So, left with only the negligence charge. The Commission found that the petitioners acted negligently essentially because the disclosure was inadequate, because it was. Absent from the record is an articulation of what the standard as to disclosure was at the various time periods. And there are two time periods here. There is the initial time period until 2011 when Form ADV was revised. And then there is a period afterwards with the revised form. The disclosure in terms of what the Commission asked for in that form doesn't change much, but the major difference is in 2011, the new revised Form ADV comes with a couple pages of general instructions. And that's important because that form is the only place one can look for what needs to be disclosed on Form ADV or elsewhere to On that, the Commission has intentionally given discretion to the investment advisor to present disclosures in a manner that their clients will understand. So, let me ask you. Your client agrees that the fidelity agreement was material, as the clients would have wanted to know about, because of the potential for a conflict of interest? Not the agreement itself, meaning the contract, but the arrangement. The fact that they were receiving compensation... I'll call it arrangement. Arrangement. The fact of receipt of compensation from a non-client in connection with investment advisory advice. And that is what initially questioned... And your clients acknowledged that was material. We have acknowledged that as material. Yes. And they knew about the arrangement. They knew about the arrangement. And what didn't they understand about the question? It's not a misunderstanding of the question. So, the question is, are you receiving any money that your clients might want to know about that might affect your judgment in the advice you're giving to your clients? Correct. The question is... And so your clients acknowledged that the arrangement was material. Yes. And they disclosed it. The issue is not whether or not it was disclosed. In response to question 13, which initially... knew the arrangement was material, that unless the commission said in its form, disclose all material financial arrangements, your clients were under no obligation, even as fiduciaries, to disclose? No, Your Honor. That's not our position at all. Okay. Yes. We were required to disclose this arrangement. I know, but your position, I think, is that they didn't have to mention the arrangement. No. Our position is we didn't have to describe it in the manner that the Securities and Exchange Commission now, or at least when they filed these charges... Well, here's what I'm trying to understand. Fidelity couldn't find it either and told your client that. They didn't find the disclosure. There is an email where Fidelity says, we want you to make this disclosure. We don't find it in your Form 80B. But in response to that, that came out of Fidelity's own issues with defending its own disclosure. They communicated it to us, and the testimony at trial was that while we disagreed that it wasn't in there, our clients were willing to do whatever it took to put in whatever detail that anyone thought was advisable, whether it was their broker-dealer, the compliance consultants that they had hired. That's not exactly true, is it, on this record, at least in terms of substantial evidence? I'm not sure I understand your question. Well, Fidelity gave them a paragraph. They didn't put that in exactly. They didn't put that in. Fidelity gave them boilerplate language and specifically said, here's something you could use, but remember, your obligation under the rules, the parameters that are applicable to you is in your discretion based on who your clients are, based on what your business is, and based on what you think they will understand. You use whatever words you think. Here's what we came up with. So my question is, this is a kickback. Why isn't that obviously something that has to be disclosed? Again, our position is it is disclosed. It was disclosed. The receipt of compensation, there's compensation directly from Investment Advice, right? The client pays directly to us, and this is compensation coming from somewhere else because of the Investment Advice. It is disclosed. It is disclosed on form 80B in response to question 13. By saying we may receive... We may receive selling compensation on certain securities transactions, yes. How can a client make any judgment based on, we might, on some unspecified transactions? How are they alerted? Certainly if you had a conflict as an attorney, that wouldn't be a sufficient or adequate disclosure. So how works so that your client could make choices? So why don't they have, why didn't they have to, why weren't they specific up front? Why didn't they just lay it out and say, fidelity is paying compensation to us because we use their platform, but only if we choose certain non-fidelity investments? Why wouldn't they, whatever was needed, why wouldn't they do that in the first instance instead of 13 years later or 10 years later? Well, and in hindsight, in seeing where we've ended up today, that would have certainly have been... Not hindsight. Why wouldn't you, as a lawyer, you'd know what to do right up front. I don't understand why they wouldn't up front have given the specifics. It seems like it was kind of pulling teeth to get them to add a word here and there over the course of 10 years. No, in fact, with respect, it was the opposite. I think that the record clearly shows that they were willing to do anything possible to get the disclosure... Then why are they so cryptic and obscure? It's not cryptic. It's description of the conflict as it appeared to them. If you adopt the commission's point of view, the inherent conflict had to be described down to the detail of which investment is selected over another. Potentially, a road ends potentially nowhere in terms of how much detail you have to give when making investment decisions on a portfolio basis, where it's comprised of individual funds within and you move based on each individual one. Taking a step back, when this arrangement came about, back in 2005, they disclosed it in the way that the conflict presented itself to them. It came in 2004 and they didn't do any disclosure until 2005. When the compensation started. I think if you look at the record... Compensation starts after investment decisions are made. You have to make the investment decisions first and then the compensation comes. The first payment from Fidelity comes after the 2005 80-day disclosure, despite the agreement being executed in 2004. Let's look at that on page 711. Is that your 2005 one? Yes. Last time, if you could point to me where they alerted clients that they had an incentive. They may not have acted on it. I'm sorry, I missed it. Where were they alerted that they had an incentive to buy non-Fidelity, to go into non-Fidelity investments? Again, that is a level of detail. A level of detail? That's just to let them know what the conflict is. Is that a level of detail or is that the conflict? That is a level of detail. The conflict, if you look at question 13, does the applicant or related person have an arrangement where it receives cash or economic benefit, including commission from a non-client? The receipt of compensation from a non-client, the receipt of outside compensation, is the conflict. That is what they are responding to in this question. Now, I understand what the SEC says later on, that they were obligated to make these other more deeper disclosures or more detail as to the other conflicts that this brings about, but the inherent conflict, what they're responding to and asked to respond to in Form 80B is the receipt of compensation. Potential conflict. Potential conflict. Yes. So, I give you my money and I'd like to know, are you getting any financial reward from recommending one type of investment as another? And that is what this disclosure says. I want to know that up front before you've received a dollar. You already have the arrangement. I have the arrangement, but... You think that you didn't have to do anything until you actually received that first check through that third party? No, that's just simply what the factual record is here. I know that there's the timing has been, they made a big issue of the timing in their brief, but that just is how the timing worked. By the time any money under this contract is paid, the disclosure had been made. The instruction requires a level of detail. It's not just check a box, yes. It says generally describe the arrangement, explain the conflict of interest, and describe how you address them. I believe that's the general instructions for 80B. Right. That would seem to require some level of detail of just describing the conflict. Yes, I agree with that, but two things. First, those instructions did not exist until 2011. Second, again, it does say describe, but remember the way form 80B is intentionally designed to give the advisor the discretion. In fact, at trial they called an SEC witness to talk about how the form works in practice, and she said it would be impossible to give guidance on how to do it because it can only be made on the facts and circumstances presented to the advisor with the knowledge of their business and their clients. And that is what they did with this disclosure. Anything further? Exhausted my time then. You want to save the rest for rebuttal? No, I'll continue. Okay, so turning from the standard of care to reasonableness. The second part of this is that the commission essentially concludes that because of the words we chose in the ultimate disclosure, it was unreasonable because we didn't use what they said we should have done. Our failure to disclose these details that they've identified is unreasonable. And in doing so, they have ignored a tremendous amount of evidence to the contrary that shows how reasonable we were to this process. For example, that from the very beginning we hired a compliance consultant, experts in the industry, to help us draft and craft these disclosures. But the evidence in the record showed a specific disclosure of the details of the agreement with Fidelity to either of these compliance consultants and those compliance consultants' approval of your form. What the record shows was that while, and granted while, the compliance consultant had no independent memory of seeing the agreement, what he testified was that he was well-trained as a former SEC examiner to look for conflicts, that he was well-trained that conflicts come from compensation, and that he was trained to, quote, follow the money. So while he could not remember one way or another being handed a copy of the agreement, that this would have been his normal business practice, and this would have been... If it was given to him by the clients. Yes, but he also testified... Did he say that even if the client doesn't give me the information, I do some affirmative investigation on my own? What he said was that in assisting the clients in Form ADV and determining conflicts, that it was his practice to follow the money, to search for... What does that mean, follow the money? Does that mean when the client... My assumption is these folks are hired by somebody, so they take the information they're given. Right. And then they analyze and write, okay, you've told me what the potential issues are, and here's your forms, and I will look at those. Is that how the process works? It could be that way. Is that how the process works? The process could work in a number of different... How'd the process work here? What evidence in the record shows how the process worked here? The record here shows that, and unfortunately a lot of it has been lost due to the passage of time from the memory of the compliance consultant who met with the petitioners, but the record shows that this would have been a receipt of compensation, not just tell me nothing. So you had your clients? We had our clients. Did your clients testify and say, Yes, we specifically gave a copy of this fidelity agreement to Renaissance, explained to them what was going on, showed them our disclosure, and they approved it. Did your clients testify to that? Aside from the part about handing the agreement, discussing the arrangement, yes. But we don't know how they discussed the arrangement. We don't know how they discussed the arrangement. But there's no memory issue there. They could tell us how they discussed the arrangement with Fidelity, but they didn't put evidence in the record saying, We told Fidelity every single detail of this. Not every single detail, but the receipt of the compensation. And that is something that would have been easy to see for anyone looking at the money because this appears on their commission statements, Fidelity 12B1 payments. There isn't a tremendous amount of money coming into the firm from different sources. So if you have your investment advisory fees coming in directly, and then this money coming into the broker-dealer, that's two sources. Anything further? I believe I'm out of time. Yes, we'll give you a couple of minutes in rebuttal. Okay. Thank you. May it please the Court, Daniel Matreau for the Securities and Exchange Commission. When an investment advisor has a personal financial interest in the investments it recommends, that strikes at the heart of the relationship of trust between the advisor and its clients, and the advisor has a fiduciary duty to disclose the potential conflict so that the investors can make an informed decision about whether to entrust their money with the advisor. Substantial evidence supports the commission's determination that the petitioners breached that duty here by failing to disclose the Fidelity agreement. Petitioners don't dispute that they knew about the agreement and had a duty to disclose it. Instead, they argue that the commission failed to establish any applicable standard of care. But the relevant standard is set forth in capital gains and its progeny. Petitioners had as fiduciaries an affirmative duty to fully and fairly disclose the arrangement and the conflict of interest that it created. This is a question about extent of disclosure, right? Whether it would have sufficiently informed the investors, right? I think at least up until December. At least as time goes on, right? At least up until December 2000. More and more detailed. What, if anything, should we make of the fact that if you look at the number of clients and the amount of business that this company is involved in, it seems like these are high net worth individuals. They're probably sophisticated investors. Is that something we should look at in assessing whether the disclosure was sufficient? The fact of an affirmative duty and the need to exercise reasonable care doesn't depend on the sophistication of the investor. No, but a sophisticated investor might be able to look at the 2011 disclosure and have alarm bells go off. So it may be that if you're dealing with a complex conflict of interest and there's a question about whether a sufficient amount of detail was used, then perhaps among other circumstances, whether it was reasonable to disclose the conflict in a certain way, the level of sophistication of the investors might play in there. But here we're talking about six, seven years at least where there was no disclosure at all of the agreement. No, but take the question as it was given. Sophisticated investors. And the disclosure says, we may receive money. All right. Is that a red flag to the investor? It says, what's that all about? Well, not when what they say they may receive does not describe this arrangement at all. All they said they may receive is selling compensation in connection with facilitating securities transactions through Triad, their broker-dealer, in their capacity as registered representatives of the broker-dealer. See, what I'm trying to understand is the notion that there have been requirements, but the question is the adequacy of the disclosure. And if what Judge Katz was referring to was some level of detail, but how much? And did they have to actually say, we have this arrangement? Or is it enough to say to the client, we may have some arrangements where we get kickbacks? I think when you actually have the arrangements and you're actually receiving payments continuously, you can't just say, we may be receiving payments. So it's the may. But in this case, I don't think the may is dispositive. That's an extra problem, the fact that they used may. What I'm trying to understand, though, is, and these are sophisticated people, sophisticated industry, all that kind of thing. But the point that it's focused on is they were making disclosures, but they were not adequate. And so where do you find out, if you're the petitioners operating the business, what's adequate? Or do you think it's just QEDs? Well, so their capital gain says you have to fully and fairly disclose the conflict of interest. Here, the conflict of interest was straightforward. It was they had an incentive to recommend certain mutual funds over other funds, and they also had an incentive to stay with Fidelity as their custodian over other potential custodians. And they didn't, up until December 2011, they didn't disclose those payments or that arrangement at all. And so the commission reasonably concluded that that's just not good enough as a fiduciary. Those are obviously inadequate disclosures, and you don't need specific guidance as a fiduciary responsible to your clients to know that you actually have to say something that allows your client to discern the relevant conflict. And nothing in the disclosures up to December 2011 would have enabled the client to discern that the petitioners were actually getting paid in their advisory business to recommend certain funds and not others. And then you get to December 2011, and you have the fact that they said only that they may receive it, but they didn't identify exactly which funds triggered the payment. They had to say may because it wasn't clear to them which didn't know which stocks would result in a payment and which investments would result in a payment and which ones would not. They said they didn't know, and the commission accepted that, and so they had to say may. But they knew they had this arrangement. They knew they were continuously receiving payments for a whole host of mutual funds, and there was no evidence of any likelihood. From their mindset, it's like an accident. We don't know what triggers it or doesn't. We're not paying attention to it. No scientific finding. So they had to say may. Didn't they, to be accurate? I think that would sort of create an incentive for them to remain ignorant about what it was. Well, whether or not there's no finding, the commission accepts that they did not have any kind of bad mindset here at all. And I thought it had accepted, maybe if I misread the decision, that they didn't know. No, you're right. So may in the December 2011 disclosure, the use of the word may is not the primary component element. I'm asking you whether it's a problem at all. It was the representation that they were not receiving any economic benefit from a non-client for investment advisory services, which was not true, and it was the fact that they did not state what it was that was triggering, what kinds of funds were triggering the payments. And so an investor looking at that disclosure wouldn't be able to know, okay, I'm sorry, go ahead. Okay, it's non-fidelity NTF funds that are triggering this payment requirement. I take it your position is that first, sorry, so JA 786, that first line on a December 2011, we do not receive an economic benefit from a non-client for providing investment advice or other advisory services to our clients. So that was just flatly wrong. Yeah, the commission's finding is that's not true, and the fact is they were receiving such payments. And somehow that remains on the latest. Yeah, and so the commission's finding of a lack of exercise of reasonable care is predicated on the fact that the disclosures were obviously inadequate for a long period of time. They simply didn't disclose the arrangement. And even when Fidelity flagged that to them and said, look, we've looked at these disclosures. The arrangement is not here. They continued to leave out some key details to help their clients figure out what was the nature of the conflict of interest. Can you just help me with one other thing, though? Do you consider the April 2014 disclosure to be adequate? The commission didn't make an explicit finding on the adequacy of that, but it said that it was at least up until April 2014, the disclosures were inadequate. And that was the only basis for. It has that same opening sentence. It has the same opening sentence. The commission didn't base its finding or its sanction, its liability finding or its sanctions on April 2014. It didn't make an explicit. It's kind of weird if the problem is the sentence. Yeah, I mean, I think it was. I think, sorry. I think the commission was considering the fact that it was finally in April 2014 where they described the specific conflict, what kinds of funds were triggering the payments, which are non-Fidelity NTF funds. And they also described the other conflict, which was that they had an incentive to choose Fidelity as their custodian. Does the cease and desist order allow them to continue repeating that first sentence? I think they would be advised, whether the cease and desist order or not existed, they would be advised not to have anything in their disclosures that were misstatements. Does the cease and desist, I'm just trying to understand what's going on here. Because it sounds like you're relying on that sentence until we get to April 2014. And then it's like, it's okay. Well, so the civil penalties are based on the complete failure to disclose up until December 2014. No, but I'm talking about there is a cease and desist order. And there is a cease and desist order. It's an injunctive command. And so to the extent they've perpetuated that language under the cease and desist order, is that violating the cease and desist order or not? I haven't looked at their current disclosures. Potentially it could, but I don't want to make any representations one way or the other. I haven't seen how they've continued to update their disclosures. Could I ask you about the section 207 count that we're done with? There's not a whole lot of reasoning in the commission's order. And to the extent there is any reasoning, it seems to be that they're on the hook because they willfully filed the forms. But what the statute requires in this case is that they willfully omitted material facts. Correct? You agree with that much? Yes, that's right. So at a minimum, don't we have to vacate the finding of liability on the 207 count? No, I think the commission's finding of willfulness is supported. Willfulness in this context, in the securities context. It's flatly inconsistent with the commission's findings. It's the same conduct underlying both counts, which is the adequacy of the disclosure on that form. And in one count, liability is triggered because it's given to the investors. And in the other count, liability is triggered because it's given to the commission. And the commission says, we find nothing worse than negligence. We don't find scienter. So how could there possibly be a liability for willfully omitting material facts? I think, Your Honor, because in this context, this court and other courts have said that willfulness doesn't look to the state of mind, doesn't depend on the state of mind of the perpetrator. To act willfully means to intentionally commit the act that constitutes the violation. Which is failing to disclose a material fact. Which is preparing a form ADV which does not contain a material fact. And there's ample evidence that they participated in, that they were responsible for drafting the ADV. Sure, but your own findings are that, with regard to mens rea, that they did nothing worse than act negligently. They didn't make the omission willfully, nor did they make it recklessly. Or intentionally. And I guess I would just go back to wants over and other cases, which make clear that all that matters, it doesn't matter whether you knowingly do it, whether you have scienter when you're committing the act that constitutes the violation. What matters is that you are aware of what you're doing. You need either scienter or, at a minimum, recklessness. I don't think wants over stands for that. In other cases, interpreting wants over or applying willfulness. So willfulness means negligence. And that has to be your position, because that's all the commission found here. Willfulness means that you intentionally committed the act that constitutes the violation. And the act is failing to disclose. They were aware of the language. They participated in the drafting of the specific disclosures here. And that is sufficient, just like the 11th Circuit said in ZPR investment management. It interpreted 203E, willfulness in 203E, the exact same way. It didn't find a scienter-based or recklessness or scienter-based violation or a failure misstatement. But it said that because the advisor was involved in creating those advertisements, knew what they said, that was enough to trigger willfulness under Section 203E. And other courts, the courts cited in wants over and other courts have made clear that it's not a scienter-based consideration. And there's a reason. Well, they seemed, I guess as I had read it, they were saying, look, it's not the super high level of scienter that you have to know it violates the law to do it. But you have to know you're doing the wrongful act. And as you keep saying, that they intentionally committed the act which constitutes a violation. And so doesn't that mean they would have to intend to not disclose the conflict? I don't think so. They have to know they were doing the act of submitting the form ADV and submitting these disclosures. They don't even have to be negligent. They just have to know they're mailing in a form. They don't have to know that the disclosures are omitting a material fact. That's what wants over and other cases say. They don't need to know that. They just need to know the statute says they have to not willfully, it doesn't say willfully file the form. It says willfully omit the material fact. Whatever is the relevant level of scienter, it attaches to the concealment, not the filing of the form. I think to willfully omit something in the securities context is to draft a disclosure that does not contain the material fact that you have to disclose. And I think it makes sense. So if there is a secretary who typed this up, obviously omitting in that typing the actual conflict, just types it up, and then mails it to the commission, will that person have willfully violated because they submitted this form, and the form didn't include a material disclosure? I mean, I think that... I would have hoped it would have been an easy no. Yeah, I mean, that's a no because... Because she didn't know, she didn't intend to submit... She was not responsible for submitting, for drafting the language in those forms. She may have been asked to type it out and submit it, but she was not responsible for choosing the language, which petitioners here testified about how they chose this language. So they have someone in their office who's responsible for filing these forms with the SEC, and you have a bad actor. The bad actor doesn't tell the person who's in charge of filing forms with the SEC about the bad acts. And so the person who's responsible for filing the forms does them and necessarily omits the material fact of what this bad actor is doing. But is that person's responsibility to do it? Is that person A whose responsibility it is to do it liable? Person A in your scenario, is that the advisor? It's my job to file these forms. That's my job. I am the commission form filer. That's my job. I'm responsible for them. I type them up. I approve freedom. I make sure they have all the requirements of the form that the commission requires. I check all that, make sure all the requirements are there. But I don't know that, in fact, there's a bad actor over here doing some very bad things. And so I'm not aware that when I said not getting money, that actor B over here has taken bribes. Did that person violate the statute? The actor A, person A, whose job is to file the forms. I think that's a different case. It is a different case, but is that person locally violating? Are they committing the violation of B7? I'm just trying to understand what you mean. I think probably not. Because unlike here, you can't show that that person knew, chose that language, was aware of the facts, and chose that language. It was my job to choose the language. And was aware of the underlying facts and had the duty. Aware of, so you have to be aware that something's being violated. No, you don't have to be aware that anything is violated. But you have to be, in this case, the petitioners were aware that they had the disclosure, aware of the requirement to disclose, and aware of the language that they chose and the facts underlying the language that they chose. And so they were not asked to do anything by someone else who was maybe hiding facts. So go back to Judge Katz's point, or question, if you will. He says the same conduct is underlying the violations of both sections. So in the first 2062 violation, it's that although they had a fiduciary duty, although they knew that this arrangement of fidelity is something their clients would want to know because of potential conflict of interest, they were negligent in not disclosing it. They didn't have any intent to harm, but they were negligent. So then we come to 207, and the commission says, essentially, and back to my point about they acknowledged this arrangement was material, the forum asked them to fill it out or to disclose it. They knew about it. They were responsible for the content. They reviewed each of the forms before filing. And Robare had authority over their content, and Jones signed each of them. So that's not your secretary or your administrator. That's the fiduciary. Yeah, exactly. But what's your response to Judge, I guess I know what it is, but to Judge Katz's point that you can't be negligent as to nondisclosure as to your client and also be willful in failing to disclose something to the commission? I guess my answer is that these are two different provisions serving two different purposes, and the purpose of Section 207 is to ensure that the commission is getting accurate information in reports, forms that are critical to its enforcement and administration of the Act, and Congress used the word willful to limit the provision to only those who are actually aware of and doing the Act, and this was not inadvertent. It wasn't by accident. These were the fiduciaries themselves who knew the underlying facts, prepared the disclosures, and intentionally chose the language in the disclosures, and that the commission needs those people to provide accurate information so that it can enforce the Act, and throughout the securities laws and other contexts. So on your theory, it is easier to establish liability under a provision that by its terms has a willfulness requirement than it is to establish liability under a different provision for which the Supreme Court has said negligence is enough. That's very strange. But I think that follows from the courts that have interpreted willfully. I mean, the commission has to find willfulness in order to impose certain sanctions, and it often gets past that willfulness barrier to impose sanctions on conduct that is at least in part negligence. Section 203E, for example, you need to have willful conduct in order to impose a bar and other sorts of remedies, and courts have long understood that you don't need to show scient or some sort of intent or knowing conduct to get past that. Once over says the defendant needs to know what he is doing, right? That's the canonical formulation of willfulness. And what he is doing in the 207 context is failing to disclose a material fact. Now, if you had put these defendants, if you had asked these defendants at the time, are you omitting a material fact from this disclosure, under your own assessment of this record, they would have truthfully said no because they were mistakenly and negligently believed that the disclosures were good enough, but there was nothing worse than that. I think that's the same thing, Your Honor, as asking whether they knew that the conduct was wrong, and that's what's not required under willfulness. If they knew they were failing to disclose a material fact, they would know that they were not complying with the law, but that's not all they need to know. No, I didn't say anything about complying with the law. They wouldn't have to know the first thing about 207. They would have to know that they're not disclosing something. And I guess I see those as functionally equivalent. If they knew they were omitting a material fact, that's essentially requiring that they know that something was wrong about their conduct, and they knew they specifically chose the language. They testified that they worked with their compliance consultants to choose this specific language, and I think that's all that willfulness requires. I just need to be clear that whatever intent is needed, once they have acknowledged that the arrangement is material, that's all the, quote, intent that's necessary to show willfulness in terms of what they put on the form. In other words, back to their point. They thought they testified. They believed they had disclosed it. All right. So I understand the commission's point, basically. It doesn't matter what they believed. They knew the arrangement was material to their investors. They didn't disclose it. But there was no intent to harm their investors. It was what? It was. It's not sloppiness, they say, because they've got all these consultants. I mean, there's no less question to say, and the commission found, the client's petitioners never testified that they received the necessary assurances that they needed. So then we get to 207, and it's just if you know about the arrangement and you don't put it, you don't mention it, that's all the willfulness is needed. Yeah. 207 is there to make sure that the commission is getting all material facts in these forms and not. Also, pushing what I understand, Judge Katz, is the implication of this question. So Congress and the commission have decided it's more important that the commission get the information than the client, because we're relying on the fiduciary duty as to the client. And, of course, if the commission finds out about this and starts an investigation or does some type of enforcement action, that will protect the client. So it really is more important that the commission get this information. So it is a strict liability in that sense. Again, I think they're serving different functions. 207 applies to all material facts, all statements and omissions of material fact. 206 here involves, we're talking about conflicts of interest, and there's an affirmative duty in every case to, as an investment advisor, to disclose material facts to your clients. So it's not, you know, it's, the requirement is still there in both cases. As an investment advisor, you have to provide the material facts to your clients and to the commission. And if you willfully fail to do so. What work is willfully doing? I think it's ensuring that, you know, that you could. That there's no liability if you file through sleepwalking. Or, you know, if certain information or facts crept into a report without someone knowing, or if someone was not responsible for the disclosures and was only tangentially involved, they need to be the ones who willfully omitted the fact. And I think that means they needed to be involved, intimately involved in providing the disclosure to the commission. And not everybody is going to be here. It was petitioners themselves. And the commission was able to show how the record shows how involved they were in that process. And they didn't need to know the facts that they were omitting willfully, that they were omitting material facts because that's essentially saying they need to know that they were doing something wrong. But the statute only applies. Oh, no, I'm sorry. I'm looking at 203. But, I mean, liability wouldn't attach unless there were personal involvement, right? Under? Under 207. Under 207? Yeah. So to say, well, the work that willfully is doing is cutting off liability from people who aren't, it's not a great answer. Which part of? I'm just saying if the only circle of people who can be liable are people who have, people who are involved in making the disclosure, right? If they're not involved in making the disclosure, they're not covered by 207 anyway. Yeah. So then what remains unclear what work willfully, the word willfully is doing. What this court said in Wantsover and what other courts have said in other contexts in the securities laws is it's ensuring that the individual intentionally committed the act. And that may be a pretty broad standard. But in the securities context, it makes sense. It makes sense in the 207 context because of the importance of getting accurate information to the commission. And it makes sense in the 203 context because there are other checks on what, once you pass that, the willfulness threshold, then you take into account the severity of the conduct, whether it's negligence or scienter. There are other opportunities to take that into account. But if you basically import a scienter standard into willfulness, I think that will have a serious impact in other contexts that would be inconsistent with the way the commission, with the way courts and certainly the commission for a long period of time have interpreted willfulness. Anything further? I'm happy to answer any additional questions on the sanctions. We believe that the commission reasonably considered the relevant factors. And otherwise, we would ask the court to deny the petition for review. And as far as your last comment on 207, all the citations to support that are in your brief. Yeah, we discuss. Well, I mean, both of the commission has long understood this and that in other contexts. Commission forms have been understood in this manner. And courts have. I know you mentioned the 11th Circuit case. Well, so we certainly cite Wansover. And Wansover itself describes the long history of the interpretation of willfulness. You can find it there in the commission order in the case. Cites other orders, I believe, where there's further discussion. One other point I forgot to make. I just want to be clear. Your view is that Wansover is dispositive. And I think what you're hearing from some of the questions is, I don't know how to say it, but maybe some questions about that. And I guess and I would point the court to ZPR investment at 861 F. That's 11th Circuit. That's 11th Circuit. Interpret 203 E in this way. There's another district court opinion that cites a bunch of cases, appellate level cases. KW Brown and Company. I think it's the Southern District of Florida. 555 F sub 2D 12. That's in your brief. Pardon? That's in your brief. I don't think we cited this district court opinion in the brief. So what is the citation? 555 F sub 2D 1275. And it's interpreting 207 in the manner that we do, that commissioned it here. And it's citing, I believe it cites Wansover and other federal appellate cases for the proposition. And did you come over any cases interpreting 213? That's talking about willfulness and penalties. 213 of the Advisors Act. Not off the top of my head, Your Honor. If I could just make one last point to Judge Tatsis. I think you asked opposing counsel whether there was a requirement to describe the arrangement in dating back already in 2004. And I just want to point out that, yes, they were required to describe the arrangement in the 2004 form. Thank you, Your Honor. Thank you. Counsel for petitions. Very briefly, in response to two things that came up when counsel was speaking. He mentioned several times, he used the phrase, obviously inadequate. The disclosures were obviously inadequate. And I'm sure you saw that comes over and over again in their brief. But the phrasing of these disclosures, where you're talking about whether or not the words that were used were sufficient. In a facts and circumstances analysis, where you defer discretion on how to do something to the advisor. Just doesn't comport with the standard today that they're obviously inadequate. Right? You have something that isn't inherently determinative on a variety of factors. Compared to the position today that it obviously didn't meet whatever standard that that was. And the other point I would like to make in response is to remember that in the absence of the articulated standard by the government. As to how this should have been made. At the time they were drafting these disclosures. What words or phrases should they have picked? And how would they know that at the time? Remember, we did put in evidence in the record. We had an expert witness that talked about the industry standard at the time. How the industry reacted to the questions. How the industry grappled with these issues. And that is something that can be taken into consideration when determining what the standard is. In addition, we had the testimony of Triad, which was their broker dealer. And there's no dispute. We spoke about the compliance consultants. But there's no dispute as to whether or not Triad was aware of this agreement. Because for the majority of the time period, they were a party to it. And there's no question that they were reviewing the forms ADB. And we've quoted the testimony from the compliance consultant in our brief. And that's important. Because when you're talking about the how of it. And whether or not the way that they did it. Even if different than another way it could have been done. Is inadequate. In the absence of parameters by which to judge that. I think it's obviously inadequate. It's just an oversimplification of real life. What these individuals were trying to do. Thank you. We will take the case under advisory.
judges: Rogers, Millett, Katsas